## MARGARET DAWES *versus* WILLIAM H. PRENTICE.

Where the parties to a deed probably intended that it should convey a strip of land of a given width adjoining and parallel to the grantees's lot, but they referred in the deed to the side of his wharf as a monument designating the line of his lot, when in fact it was the true boundary of only part of his lot, and if extended, would fall within his lot, it was *held*, that the monument must govern as the parties intended it should do, and that this particular intent must control the general intent.

There being several inlets into different sections of the wharf so referred to, caused

Dawes
v.
Prentice.

by making towards low-water mark additions to an old wharf, it was *held*, that the side of this old wharf must be taken as the monument, because it had in former deeds been referred to as fixing the boundary of the grantee's lot, and because there had never been any dispute as to its being the dividing line between his lot and the granted premises, down to the end of this old wharf.

A parcel of land, wharf and flats, was granted, bounded westerly on Purchase street, there measuring 112 feet, northerly on land of G, there measuring from Purchase street to the capsill of the wharf 114 feet, and from thence to run down to low-water mark, easterly on the sea or salt water, there measuring at the capsill of the wharf 87 feet, southerly on land of A, there measuring from Purchase street to the capsill of the wharf 114 feet, and from thence down to low-water mark. *Held*, that the land conveyed was not intended to measure 87 feet at low-water mark, but that the northerly and southerly boundary lines, which were certain for 114 feet from Purchase street, were to be run straight, and consequently converging, to low-water mark.

THIS was a writ of entry, in which the demandant claimed two twelfths of a certain parcel of flats-ground, upon which the tenant had recently erected a part of a wharf, as shown by a plan taken by order of Court for this cause. *

The action was tried before *Wilde* J., upon the general issue.

The demandant contended that he was entitled to recover the premises, either under a deed from Dudley Woodbridge and Dorcas, his wife, to Thomas Dawes, senior, deceased,

a  Purchase street.  
b  Russia wharf.  
c  Tileston's wharf.  
d  Channel.  
e  Prentice's wharf.  
f  Added since July 1831.  
gg  Dawes's wharf.

hh  Dock.  
i  House.  
m  Parallel to line of Dawes's wharf  
    marked k, l.  
n  Old wharf wall.  
o  Line of old wharf wall extended

dated October 10, 1767, or under a deed from Samuel Dilla-
way, to the same Thomas Dawes, dated June 18, 1790.

In the deed from Woodbridge and wife to Dawes, the land
granted is described as a parcel of land, wharf and flats,
situate on Purchase street, in Boston, bounded " westerly on
Purchase street, there measuring one hundred and twelve feet,
northerly on land of Edward Gray, there measuring from
Purchase street to the capsill of the wharf about one hundred
and fourteen feet and from thence to run down to low water,
easterly on the sea or salt water, there measuring at the capsill
of the wharf about eighty-seven feet, southerly on land of the
heirs of Samuel Adams, Esquire, deceased, there measuring
from Purchase street aforesaid to the capsill of the wharf
about one hundred and fourteen feet, and from thence down
to low-water mark, be either of the aforesaid measures more
or less, or however otherwise the said land and premises are
bounded or reputed to be bounded." A deed from John
Hood to Thomas March, dated April 3, 1750, describes the
same land in nearly the same language.

In the deed from Dillaway to Dawes the land granted is
described as follows : " Beginning to measure from the north-
easterly corner of said Dawes's land lying on the south-
easterly side of Purchase street, in said Boston, and so
running across a seven foot passage-way, and on said Purchase
street with the northwesterly bounds of said ancient house
nineteen feet, including said passage-way, (said passage-way
being part of what I now sell,) then turning and running
southeasterly, nearly at right angles, through said ancient
house and through the yard and short wharf before the same,
taking the whole nineteen feet in width as you go, and running
parallel with the northeasterly side of said Dawes's wharf
down on the salt water as far as said Dillaway's right
extends."

The wharves and flats called Prentice's wharf and Dawes's
wharf, lie between Russia wharf on the north, and Tileston's
wharf on the south, and the trial proceeded upon the sup-
posed accuracy of the boundaries of Russia wharf and Tile-
ston's wharf as laid down on the plan.

The demandant became nonsuit, subject to the opinion of

Dawes
v.
Prentice.

March 27th.

April 8th.

the Court upon the effect of the deeds from Woodbridge **and** wife, and from Dillaway, to Dawes.

*Sohier*, for the demandant.

*S. Hubbard* and *Peabody*, for the tenant.

WILDE J. delivered the opinion of the Court. This case at the trial turned on the construction of two of the demandant's title deeds ; the one from Dudley Woodbridge and wife to Thomas Dawes, deceased, and the other from Samuel Dillaway to the same grantee.

It was the opinion of the presiding judge, that, by the true construction of those deeds, the demanded premises were not included ; and consequently that the demandant's title failed. The demandant thereupon became nonsuit, subject to the opinion of the whole Court upon the effect of those two deeds.

I shall, in the first place, consider the question in relation to the deed of Dillaway to Dawes. The description is as follows : " Beginning to measure from the northeasterly corner of said Dawes's land lying on the southeasterly side of Purchase street, and so running across a seven foot passage-way, and on said Purchase street with the northwesterly bounds of an ancient house nineteen feet &c., then turning and running southeasterly nearly at right angles through said ancient house and through the yard and short wharf before the same, taking the whole nineteen feet in width as you go, and running parallel with the northeasterly side of said Dawes's wharf down on the salt water as far as said Dillaway's right extends."

The parties agree as to the first boundary, the northeasterly corner of Dawes's land, and as to the first line, which is to be nineteen feet on Purchase street. The question is, in what direction the northerly line of the granted premises is to run down to the salt water, at low-water mark.

The demandant's counsel contend that it should be a line parallel with the northerly line of Dawes's lot, because it must be presumed that such was the intention of the parties, and that such an intention is manifest from the circumstances attending the purchase.

On the other hand, the counsel for the tenant insist, that the

line must be run parallel to Dawes's wharf, as it stood at the time of the purchase, because this corresponds with the express words of the grant, which refers to the wharf as a monument, by which the direction of the line in question is to be ascertained.  And we are all of opinion, that the deed must be construed as contended for by the tenant's counsel. Not that we doubt the intention of the parties, as contended for by the demandant's counsel, and that generally the intention of the parties will govern as to the construction of deeds. But if the intention was to convey a strip of land, nineteen feet in width, next adjoining the grantee's wharf estate, as it probably was ;  still if the parties agreed upon the line of that estate, and referred to a monument, designating that line, in the conveyance, the monument must govern, for it was intended to govern, undoubtedly ;  and that particular intent must control the general intent.   The one is certain, and expressly declared in the deed ;  the other is uncertain, and not so declared.   If then it should be now ascertained, that the northerly side of the wharf did not correspond with the northerly line of Dawes's lot, the side of the wharf, being referred to in the deed as a monument, must control and direct the line in question.  Adopting this construction, there would be no difficulty in laying down this line, if the side of the wharf had been on a straight line throughout.   But as there were several inlets into different sections of the wharf, it becomes important to ascertain to which part of the wharf the deed from Dillaway refers.   And we think it must be supposed to refer to the upper part, or the old wharf ;  because the northerly side of that old wharf was referred to as a monument fixing the northerly line of Dawes's lot, as appears by the deeds from Hood to March, and from D. Woodbridge to Thomas Dawes ;  and because it does not appear, that there ever has been any dispute or doubt as to the dividing line between the two lots down to the end of the old wharf.

When the wharf was further extended, inlets were made for the convenience of laying vessels so as not to obstruct the passage to the wharf above, as may be supposed, and the parties must have known, that these new erections were not on the dividing line between the two lots ;  for there is nothing

to show that this was not a straight line ; on the contrary, it appears from all the deeds that it was, or was intended to be. There was a little bend in the line running from Purchase street down to the end of the old wharf, arising probably by inadvertence, when that wharf was erected. This circumstance, however, does not affect the present case.

But supposing that the whole wharf was referred to in Dillaway's deed ; we think the true construction would be, that a line should be drawn from the lower corner of the old wharf to the corner below, which extends furthest to the northward, and from thence on the same course to low water, and that this should be taken as the southerly line of the strip of land conveyed by Dillaway.

This would be more unfavorable to the demandant than the other construction, which we have no doubt is the true one, and is in conformity with the intention of the parties so far as we can judge from the terms of the deed.

I will in the next place state very briefly the opinion of the Court as to the construction of the deed from Woodbridge to Dawes. The lot conveyed by that deed, is bounded westerly on Purchase street, there measuring 112 feet. As to this boundary there is no question. Then northerly on land of Edward Gray, there measuring from Purchase street to the capsill of the wharf, about 114 feet, and from thence to run down to low-water mark. The question is, how this line is to be run. As to the first part of the line, the 114 feet to the capsill of the wharf, there is no question. Whether that was on the true line between the lot conveyed, and the lot of Edward Gray, is immaterial, because the capsill of the wharf must be taken for a monument, which will control the other part of the description, and as to this part of the line there has never been any dispute between the parties.

But it has been argued by the demandant's counsel, that from and below the wharf, the lot conveyed was to keep its width, as it measured at the wharf, (which was about 87 feet,) down to low water ; but there is nothing in the terms of the deed to show that the lot was to measure 87 feet at low water ; but the contrary must be inferred, as the side lines of the lot from Purchase street to the wharf are converging, and

the measure of the width of the lot is given at the wharf, and not at low water. And there is no indication given of any change in the course of the line below the wharf. We are of opinion, therefore, that this northerly line of the Dawes lot is to be run from Purchase street to the capsill of the old wharf, and along the capsill to the lower end of the wharf, as it was at the time of the grant ; and so continuing the same course of the capsill of the wharf to low-water mark. , This line will correspond with the line as indicated in the deed from Dillaway to Dawes, and although it may not perhaps be the old dividing line between these lots, it seems to be the line designated by the conveyances in question. It runs from Purchase street to the capsill of the wharf, and although it is not expressly declared to run on the capsill of the wharf to the lower end thereof, yet it is obviously to be so understood, " and from thence to run down to low water."

There is no change of course indicated, and the construction must be, that the line below the wharf is to run the same course as the line of the wharf.

When a lot is bounded by the sea, the side lines of the upland down to the shore are to be continued over the flats, if the flats pass, whether the lines are parallel, or converging, or diverging ; unless the contrary is to be inferred to be the intention of the parties by the terms of the conveyance, or unless the lots are so situated on a bay or cove, or otherwise, that there is not space enough to carry out the lines without infringing upon other rights.

*Nonsuit confirmed.*